UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        NO. CR. S-10-061 LKK

        Plaintiff,

    v.                    O R D E R

FREDERICK SCOTT SALYER,

        Defendant.

_____/

    In 2007 and 2008 the government sought, and this court granted, authority to wiretap two phones used by Randall Rahal in connection with its criminal investigation of Rahal, defendant Frederick Scott Salyer and others. Defendant Salyer seeks to suppress the fruits of these wiretaps.[1] He asserts that the

---

    [1] Salyer is an "aggrieved person" with standing to seek the suppression of captured conversations to which he was a party, even though the wiretaps were placed on the phones of Randal Rahal in New Jersey, and not on Salyer's phones or premises. See 18 U.S.C. § 2518(10)(a) (any "aggrieved person" may move "to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom"); Alderman v. U.S., 394 U.S. 165, 176 & n.9 (1969) (a person is "aggrieved" with regard

1

wiretaps were not necessary, and that the affidavits submitted in support of the wiretaps contained falsehoods and omissions.

The court finds that the affidavits submitted in support of the wiretap applications adequately explained the necessity for the wiretaps, and that the omissions and any arguably false statements in the affidavits were not material. Accordingly, and for the reasons set forth below, the motion will be denied.

## I. THE GOVERNMENT SEEKS WIRETAP AUTHORITY

On June 4, 2007, the government sought the first wiretap of two phones used by Randall Rahal. Artley Aff. (Dkt. No. 166-1) (June 4, 2007) (the first affidavit). The government sought a 30-day extension on July 5, 2007 (Dkt. No. 168-3) (the second affidavit). It sought a second wiretap on February 21, 2008 (Dkt. No. 165-10) (the third affidavit), and an extension of that one on March 25, 2008 (Dkt. No. 164-5) (the fourth affidavit).

Although Rahal was asserted to be the owner of Intramark in New Jersey, the government also asserted through these affidavits, that Rahal "works on behalf of, and may be part owner of, SK Foods" (166-1 ¶ 6).[2] It further asserted that: (i) Rahal "and others at SK Foods" were bribing the purchasing managers at various companies to buy from SK Foods rather than from the competition (166-1 ¶ 6);

---

to "unlawfully overheard conversations of a petitioner himself or conversations occurring on his premises"); Government Opposition at 16 (Dkt. No. 193 at 21) ("The government concedes that the defendant has standing to suppress any oral or wire communication to which he was a party.")

[2] Generally, this order cites only the first affidavit where the referenced material occurs.

(ii) Rahal "and others at SK Foods" were engaged in price fixing with two competitors of SK Foods (166-1 ¶ 7; 164-5 ¶ 7); and that (iii) Rahal "and some of the other individuals at SK Foods" were selling adulterated food to its customers (166-1 ¶ 7).

Eight of the original targets, including Rahal, eventually pled guilty after the last of the wiretaps was completed, with five of the targets signing cooperation agreements with the government. Rahal was the first of the targets to sign a cooperation agreement, eight (8) months after the last wiretap authorization had expired. Five (5) targets entered guilty pleas and agreed to cooperate: (i) Randall Rahal (Intramark);[3] (ii) Jennifer Lou Dahlman (SK Foods);[4] Alan Scott Huey (SK Foods);[5] (iii) Jeffrey Sherman Beasley (SK Foods);[6] and (iv) James Richard Wahl, Jr. (Frito Lay).[7] Three (3) targets pled guilty without cooperation agreements: (v) RobertC. Turner, Jr. (B&G Foods);[8] (vi) Robert Watson (Kraft

////

////

---

[3] <u>U.S. v. Rahal</u>, 2:08-Cr-566-LKK (Dkt. No. 7) (December 16, 2008).

[4] <u>U.S. v. Dahlman</u>, 2:09-Cr-62-LKK (Dkt. No. 7) (February 18, 2009).

[5] <u>U.S. v. Huey</u>, 2:09-Cr-468-LKK (Dkt. No. 3) (November 4, 2009).

[6] <u>U.S. v. Beasley</u>, 2:09-Cr-351-LKK (Dkt. No. 5) (August 25, 2009).

[7] <u>U.S. v. Wahl</u>, 2:09-Cr-40-LKK (Dkt. No. 3) (January 27, 2009).

[8] <u>U.S. v. Turner</u>, 2:09-Cr-145-LKK (Dkt. No. 9) (May 5, 2009).

Foods);[9] and (vii) Michael Chavez (Safeway).[10]

The purpose of the wiretap request was said to be to gather all pertinent information about the alleged bribes, price-fixing and the sale of adulterated food products (166-1 ¶¶ 21; 165-10 ¶ 24).[11] Specifically, the government wanted to corroborate information about the targets engaging in the various alleged activities, identify others at SK Foods and elsewhere who were involved in the activity or had knowledge, identify other phones used in criminal activity, identify the methods for covering up the criminal activity, discover what happened to the proceeds of the bribes and find new members of the conspiracy (165-10 ¶ 24).

In explaining the need for the wiretaps, the government set forth the traditional investigative methods it had already employed, and the reasons it asserted those means were insufficient

---

[9] U.S. v. Watson, 2:09-Cr-35-LKK (Dkt. No. 7) (January 27, 2009).

[10] U.S. v. Chavez, 2:10-Cr-2-LKK (Dkt. No. 7) (January 20, 2010). Defendant mentions Steven James King, who also pled guilty. U.S. v. King, 2:10-Cr-59-LKK (Dkt. No. 3) (February 18, 2010). However, King was never identified in the affidavits as a target.

[11] In addition, the third affidavit asserted that SK Foods was engaged in a "bill and hold" fraud against its customers and its creditors, in which customers paid extra to have SK Foods set their product aside until they were ready to receive delivery, and SK Foods used the set-aside product as assets in getting credit (165-10 ¶ 9). But in fact, the affidavit asserts, SK Foods was not holding the product aside (164-10 ¶ 9). Instead, Salyer and his confederates are asserted to have raided other customers' orders to get enough product to ship to the "bill and hold" customers (164-5 ¶ 9). However, there is no reference to the "bill and hold" fraud in the "goals of the investigation" section, or in the "necessity" section, nor is any connection with Rahal's phone alleged. Accordingly, those allegations will not be considered in reviewing the propriety of the wiretaps.

to meet its investigative goals.  The affidavits also explained why the government had not used other traditional investigative methods.

**II.    STANDARD FOR SUPPRESSING WIRETAP EVIDENCE**

The federal wiretap statute provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial ... if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515; <u>U.S. v. Donovan</u>, 429 U.S. 413, 432 (1977).  The statute further provides for the suppression of wiretap evidence if "the communication was unlawfully intercepted."  18 U.S.C. § 2518(10)(a)(i); <u>Donovan</u>, 429 U.S. at 432.  A communication was "unlawfully intercepted" if it was obtained in violation of Section 2518:

> The words "unlawfully intercepted" ... require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

<u>U.S. v. Giordano</u>, 416 U.S. 505, 527-28 (1974).

Defendant asserts that the wiretaps were obtained in violation of 18 U.S.C. § 2518(1)(c), which requires that the application for wiretap contain "a full and complete statement as to whether or not

5

other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This provision, together with 18 U.S.C. § 2518(3)(c),[12] constitutes the "necessity" requirement, which must be satisfied in order for the government to overcome "the statutory presumption against granting a wiretap application." <u>U.S. v. Ippolito</u>, 774 F.2d 1482, 1485-86 (9th Cir. 1985); <u>United States v. Gonzalez, Inc.</u>, 412 F.3d 1102, 1112 (9th Cir.2005) ("To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity").[13]

Pursuant to the necessity requirement, the government must show that "the normal investigative techniques employing a normal amount of resources have failed to make the case" against the targets "within a reasonable period of time." <u>U.S. v. Spagnuolo</u>, 549 F.2d 705, 709 (9th Cir. 1977). Complete failure of those other techniques is not required; rather they "need only to have reached a stage where further use cannot reasonably be required." <u>Spagnuolo</u>, 549 F.2d at 710 n.1.[14] Nevertheless, the government cannot "ignore avenues of investigation that appear both fruitful

_____

[12] After reviewing the affidavit the court may issue the wiretap order <u>ex parte</u> if it determines that " ... normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried ...." 18 U.S.C. § 2518(3)(c).

[13] <u>As amended</u>, 437 F.3d 854 (2006).

[14] <u>Citing</u> <u>U.S. v. Sandoval</u>, 550 F.2d 427 (9th Cir. 1976), <u>cert. denied</u>, 434 U.S. 879 (1977).

and cost-effective," lest it be able "to secure a wiretap in every case, even where a normal strategy would be likely to achieve the same result without resort to the serious intrusion that a wiretap necessarily entails." <u>Ippolito</u>, 774 F.2d at 1486.

The government's showing of "necessity" is not defeated because it has already gathered "some evidence" against the targets. <u>U.S. v. Decoud</u>, 456 F.3d 996, 1007 (9th Cir. 2006), <u>cert. denied</u>, 551 U.S. 1116 (2007). Rather, necessity may persist where the government still needs "to 'develop an effective case'" against the targets of the investigation, that is, "'evidence of guilt beyond a reasonable doubt.'" <u>Decoud</u>, 456 F.3d at 1007.[15] Defendant correctly points out that boilerplate allegations in the affidavit will not suffice, <u>citing</u> <u>U.S. v. Kerrigan</u>, 514 F.2d 35, 38 (9th Cir.) (per curiam) (denying motion to suppress wiretap evidence, even though the supporting affidavit was "marginal"), <u>cert. denied</u> 423 U.S. 924 (1975).

Overall, the court applies a "'common sense approach'" in which it applies "a standard of reasonableness to evaluate the government's good faith effort to use alternative investigative means or its failure to do so ...." <u>U.S. v. Blackmon</u>, 273 F.3d 1204, 1207 (9th Cir. 2001).

**III. ARGUMENTS**

Because defendant argues that the government failed to make the requisite showing of "necessity," the court focuses its

---

[15] <u>Quoting</u> <u>U.S. v. Brone</u>, 792 F.2d 1504, 1506 (9th Cir. 2002), and <u>U.S. v. McGuire</u>, 307 F.3d 1192, 1198-99 (9th Cir. 2002).

attention on those portions of the affidavits supporting the wiretap applications. Defendant does not challenge the showing of "probable cause" except as part of his defunct "fruit of the poisonous tree" argument.[16] Because defendant asserts that the necessity showing was tainted by lies and material omissions, the court takes that up in Part B.

**A. Necessity.**

    **1. Defendant's Argument: The government already had enough evidence.**

Defendant argues that the government already had so much evidence, gathered from informant Manuel's seizures and recordings, and prior wiretaps, that further wiretaps were not necessary. Indeed, defendant essentially portrays the informant – an SK Foods employee – as all-powerful, able to gather instantly any piece of evidence regarding any target the government wanted, from anywhere. In fact, the Artley affidavit fully and adequately explains why the government sought wiretap evidence beyond that which it had already gathered from the informant and elsewhere.

Specifically, the goals of the investigation were not simply to gather evidence against defendant, SK Foods and SK Foods

---

[16] Defendant's "fruit of the poisonous tree" argument, based upon his assertion that the wiretaps are the fruit of the allegedly illegal searches by the government's informant, is precluded by his lack of standing to challenge those searches. See <u>U.S. v. Reyes-Bosque</u>, 596 F.3d 1017, 1031 (9th Cir.), <u>cert. denied</u>, 562 U.S. ____, 131 S. Ct. 249 (2010) ("Ramirez-Esqueda does not have standing to challenge this search, and therefore cannot make the 'fruit of the poisonous tree' argument").

employees.[17]    Rather, the investigation was looking for, among

other things: other purchasing agents, not associated with SK

Foods, who had received bribes from Rahal, and details about those

bribes, including what was purchased with them; other purchasing

agents, not associated with SK Foods, whom Rahal planned to bribe

or whom he had attempted to bribe; and other phone numbers used by

Rahal and those of his criminal associates, not necessarily

associated with SK Foods, whom he had spoken with (Dkt. No. 166-1

at ¶ 21).[18]

        Defendant does not assert that the government had this

information, either through Manuel's seizures or recordings or

otherwise.    Nor does defendant explain how the government could

have obtained such information through its informant, or through

means other than the requested wiretaps.

> **2.    Defendant's argument: The targets pled guilty**
>
> **without much reliance on the wiretaps.**

        Defendant argues that when the targets finally pled guilty,

most of the evidence used was gathered before the third affidavit

---

[17] Defendant's arguments would make more sense if the investigation had been all about him and SK Foods and no one else. But the indictment, the affidavits and the subsequent guilty pleas by those not employed by SK Foods, disclose that the investigation reached beyond defendant and his company.

[18] At oral argument, defendant asserted that the informant, Manuel, held "the keys to the kingdom."    The government answered that it was Rahal who held the "keys to the kingdom," that is, to the broader investigation into the activities of the purchasing agents and other companies the government was investigating. Rahal, not Manuel, was the broker who dealt the most with the non-SK Foods purchasing agents, and allegedly paid the bribes to them, according to the government.

was filed. Therefore, he argues, the government could have gotten the targets to plead without the wiretap sought by that affidavit.

Defendant is arguing, unpersuasively, with the benefit of hindsight. "Necessity exists if probable cause is established in the affidavit according to the principles discussed above. It must be shown to exist at the time application for the warrant is made, and it is entirely irrelevant that hindsight shows the purposes of the wiretap were not achieved." U.S. v. Martinez, 588 F.2d 1227, 1232 (9th Cir. 1978).

In any event, the court disagrees with defendant's hindsight characterization of the usefulness of the wiretaps in obtaining guilty pleas. In fact, "wiretapped calls [between Rahal and Beasley] were played for Beasley at the 7/13/09 interview," and Beasley then pled guilty, with a cooperation agreement, a month later. See Golub Decl. Exh. B (Dkt. No. 394-2). A "[r]ecorded call between Rahal and Huey was played during [Huey's] 9/2/09 interview," and Huey then pled guilty, with a cooperation agreement, two months later. Id. A "[r]ecorded call between Rahal and Salyer ... appears to have been played for Rahal during the 10/29/08 interview," and Rahal then pled guilty, with a cooperation agreement, a month and half later. Id. Also, a wiretap was played for Wahl after he pled guilty and agreed to cooperate. Id. The fact that other defendants did not have wiretaps played before they pled guilty – three of them with no cooperation agreements – does not undermine the utility of the wiretaps.

In addition, the affidavits state that the government sought

10

the wiretaps to find other co-conspirators – those who might emerge with the dawn of the new buying season around the time of the third affidavit – not just the ones the government already had in its sights.

### 3. Defendant's Argument: The government failed to use traditional investigative tools.

Defendant argues that "Agent Artley could have, but failed to take advantage of traditional investigative tools like search warrants and subpoenas before seeking the first wiretap and extension" (Dkt. No. 393 at 35).[19] But Agent Artley's exhaustive affidavits establish that he did take advantage of traditional investigative tools: use of information supplied by a private investigative firm; research on public databases; use of a confidential informant – Manuel – including documents and recorded conversations he provided; a search warrant (for the informant's residence); analyses of bank, credit card and tax return records; pen registers; discussions with FDA officials; analysis of telephone subscriber records; surveillance; witness interviews; and

_____

[19] Earlier, defendant's language implied that the government did not bother to use <u>any</u> traditional investigative techniques, "including physical surveillance, trash runs, interviews of subjects/persons, <u>undercover agents/informants</u>, grand jury subpoenas[,] search warrants, and telephone toll records/pen registers," claiming that Agent Artley asserted that they "would not avail him." Motion To Suppress at 25 (Dkt. No. 156 at 31) (emphasis in text). In fact, Agent Artley's affidavits assert that he used <u>all</u> of those traditional methods, other than grand jury subpoenas, but that they were not sufficient (although he did not use search warrants after the investigation into the informant was completed, and he conducted witness interviews only of persons other than SK Foods employees).

1  trash runs.

2  Defendant challenges the government's assertion that the
3  surveillance was not effective, asserting that the affidavits
4  characterize the surveillance results "in <u>conclusory fashion</u>" (Dkt.
5  No. 156 at 25). There is nothing "conclusory" about the
6  government's affidavits regarding surveillance. The affidavits
7  disclose when Rahal was put under surveillance, where, who was
8  present, what was the reason Rahal was there and how long the
9  surveillance lasted.[20] They further disclose that the surveillance
10 was insufficient because of the agent's inability "to overhear
11 conversations which took place in crowded public places." Although
12 the last assertion by Artley is the repetitive type that defendant
13 objects to in this case, it is entirely reasonable to repeat an
14 explanation that continues to be true despite the surveillance
15 efforts. This is, after all, not a drug conspiracy, where the
16 government could swoop in once the agents saw people meeting and
17 packages changing hands. In this case Rahal and the others under
18 surveillance would be expected to attend conferences together and

19 _____

20    [20] The four affidavits Agent Artley filed in support of the
   wiretaps disclose several specific surveillance attempts on Randall
21 Rahal, but assert that they were unsuccessful in meeting the goals
   of the investigation. <u>See</u> First Affidavit ¶ 102 (month-long
22 surveillance in January 2007 at Sacramento Convention Center) and
   ¶ 103 (surveillance at Sheraton Hotel and restaurants in
23 Sacramento); Second Affidavit ¶ 99 (Monterey, CA area surveillance,
   including SK Foods corporate offices); Third Affidavit ¶ 100
24 (January 17, 2008 surveillance in Monterey, CA area); Fourth
   Affidavit ¶ 51 (week-long surveillance in February 2008 in San
25 Diego, CA area at a conference). Defendant has pointed to no case
   in this Circuit that has identified this level of surveillance
26 activity as insufficient.

to talk with each other – entirely lawful conduct. Accordingly, the surveillance apparently failed each time and in exactly the same way. This is sufficient to establish that surveillance had been tried and failed.

Defendant's argument that Artley should have used grand jury subpoenas, even more search warrants,[21] and interviews of SK Foods employees, is without merit. Agent Artley adequately explained why use of these techniques would not likely have been productive.[22] At the time the wiretaps were authorized, the court already knew that these other investigative techniques could have been used prior to the wiretaps, but it was convinced by the affidavits that those techniques would not have been sufficient. Defendant simply disagrees, without presenting any new facts to show that the court was not fully informed.

Rather, defendant cites the success of the post-wiretap search warrants as evidence that the government should have gotten them before the wiretaps (Dkt. 393 at 29-31). This argument could prevail only if defendant made a showing that the documents retrieved pursuant to the search warrants would have obviated the need for the wiretaps, had the search warrants been executed first.

---

[21] The federal investigators did use search warrants in its investigation into the informant, Manuel. Dkt. No. 166-1 at ¶ 39.

[22] Indeed, this court is aware of no Ninth Circuit authority that has denied a wiretap application for lack of grand jury subpoenas, search warrants or certain witness interviews, in the face of as thorough an investigation as is described in the Artley affidavits. It simply is not necessary to employ every single conceivable investigative technique, no matter how unlikely to succeed, before seeking a wiretap.

Defendant has not done so. Defendant does set forth the breadth of the search warrant applications. However, he fails to make any showing that documents, computers, or other things retrieved from the premises of SK Foods would have obtained the evidence the government needed against <u>Rahal</u> in his dealings with co-conspirators not associated with SK Foods. Nor is there any showing of how those documents would identify new bribe recipients Rahal may have identified in phone conversations. In fact, the wiretaps were directed primarily at Rahal and those actual or potential co-conspirators he spoke with over the phone, some of whom were not associated with SK Foods. The search warrants, on the other hand, were directed primarily at Rahal, SK Foods and SK Foods personnel (although of course they could also produce evidence of co-conspirators whose names happened to turn up in those documents).

Even excluding the government's less persuasive, add-on reason -- that it did not seek search warrants because it did not know where to find the documents -- the reasons presented to the issuing judge appear to be sound: subpoenas would produce more Fifth Amendment invocations than evidence; interviews of SK Foods employees would just alert the company that it was time to destroy documents; search warrants are most effective when the (secret) investigation is nearly over; and these methods would not produce adequate evidence of the targets' state of mind.

////

////

**4. Defendant's Argument: The Wiretap Is a Fishing Expedition.**

Defendant argues that the February 21, 2008 application for a wiretap was just a "fishing expedition." He argues that there was a "striking" lack of specificity, that the affidavit failed to state what information is sought. And, he argues, the affidavit failed to disclose a lack of evidence despite years of investigation, including 60 days of wiretaps six months before.

I cannot agree. The government was clear about what it was seeking – corroboration of information obtained by the informant that Rahal was making incriminating statements over the phone, and additional co-conspirators emerging with the start of the new buying season. The informant was able to record conversations that he initiated, but it appears that he was unable to record the conversations when Rahal called the informant. The government could not reasonably have based its case on the informant's testimony about what Rahal had admitted, given the informant's sordid history. It seems reasonable that the government wanted to be able to present Rahals' admissions from his own mouth, rather than as testimony from a seriously tainted informer.

Defendant says that the government "has dozens of consensual recordings by mole Anthony Manuel, and had hundreds of telephone calls intercepted from the wiretaps approved in the summer of 2007." Defendant's Suppl. Brief at 7 (Dkt. No. 393 at 11). That may be, but it does not undermine the government's need to intercept more of Rahal's conversations, especially in light of the

1  new buying season, with the possibility of new conspirators coming
2  to light.

3      **B.   Alleged Falsehoods and Omissions.**

4      The crux of defendant's argument is that Agent Artley's
5  affidavits are undermined by falsehoods and omissions, and that a
6  <u>Franks</u> hearing[23] is necessary to determine their extent and impact.

7           **1.   Defendant's Argument: The affidavits misrepresented**
8                **the effectiveness of the informant.**

9      Defendant asserts that Agent Artley's representations about
10  the effectiveness of the informant were "demonstrably false."  The
11  court  disagrees.   In  fact,  defendant  objects  principally  to
12  Artley's <u>characterizations</u>, not his simple up or down statements
13  of fact.  For example, Agent Artley's affidavits state:

14      Although  Witness  #  1  [the  informant,  Manuel],  is  able  to
15      provide  significant  amount  of  information  regarding  the
16      criminal  activities  of  the  targets,  he  does  not  have  full
17      access to their face-to-face encounters or to the content of
18      their conversations over the phone.

19  Dkt.  No.  166-1  ¶  180.   Defendant  counters  with  different
20  characterizations,  asserting  that  in  fact,  the  informant  had
21  "significant  access  to  targets  of  the  investigation,"  access  to
22  "significant conversations," and the ability "to make recordings
23  at will" (Dkt. No. 441 at 6).

24      Defendant's blanket assertions about the informant's ability

25

26      [23] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

to make recordings, is belied by the affidavits.  In explaining why the informant was not sufficient to meet its investigative goals, the affidavits identified several occasions in which the informant spoke with Rahal by telephone but was not able to record the conversation.  See Dkt. No. 165-10 ¶¶ 36 (not able to record January 10, 2008 call initiated by Rahal), 41 (not able to record January 24, 2008 call initiated by Rahal), and 43 (not able to record February 1, 2008 call apparently initiated by Rahal).  See also Dkt. No. 165-10 ¶ 39 (target Beasley tells informant about a telephone conversation with Rahal to which the informant was not a party).[24]

Moreover, defendant's counter-characterizations, even accepted as accurate, do not show that Artley's affidavits were false.  To the contrary, Artley's assertions are characterizations of the informant's limitations, made in the context of the entire affidavit, were reasonable, for the most part.  In that context, it can be seen that the affidavits disclose the information that defendant says was withheld.  Thus, the affidavits disclose that the informant had access to Rahal and other Targets, that he overheard conversations over the telephone, and that he made recordings of targets.  Artley's characterization of them however, was that these leads were not sufficient, not they they were non-

---

[24] It does appear, however, that Rahal could record phone calls that he initiated, or some of them, as well as some face-to-face meetings.  See Dkt. No. 165-10 ¶¶ 38 (recorded January 11, 2008 call initiated by informant), and 40 (recorded January 24, 2008 face-to-face meeting).

existent.  Artley's characterizations of the informant's ability to "learn things," to overhear conversations, to record conversations, and to meet face-to-face are similarly not put into question by defendant.

Two of those characterizations, however, are worth discussing separately.  The government's affidavits assert that the informant's assistance was limited by the scope of his employment at SK Foods.  Defendant asserted at oral argument, and the government has never disputed, that in fact the informant rose to the highest levels in the SK Foods executive suite, a fact that was not disclosed in the affidavits.  Thus, to the extent the informant's assistance was limited, it was not likely limited by his circumscribed job duties.  Even if this was arguably a falsehood (or an omission in that the change in his position at the company was not disclosed), it is not material in the context of the wiretap application.  The affidavits fully explain that the informant's assistance was limited for other reasons, including the important fact that he did not have full access to non-SK Foods targets.  The <u>material</u> fact is that the informant's assistance was limited, and the reasons for the limitation are set forth in the affidavit.  The government's use of the informant's "limited job duties" as a repeated reason for the limitation is unfortunate, but not material in this case.[25]

---

[25] The government's constant repetition – through all the affidavits – of the informant's "limited" job duties, while omitting any hint about the ever-increasing role the informant apparently played in the company, does not represent affidavit

Second, the government asserted that it needed the wiretaps because it did not know where every document was kept, information it would need to obtain a search warrant.[26]   That justification does appear to be rather weak, since the informant, with his ever-increasing job duties, could presumably have told them where the documents were kept.[27]   Omitting this assertion from the affidavits, however, there remain very good reasons for authorizing the wiretaps.[28]

_____

drafting at its best, however.  In response to the court's query about this repetition at oral argument, the government asserted that its description of the informant's job duties was like repeating that a sprinter was still not running fast "enough," despite the fact that his speed was increasing all the time.  In fact, the court believes that it is more properly analogized to a repeated description of the sprinter as running just as slowly as ever, despite his (undisclosed) ever-increasing speed.  The court entirely rejects, however, defendant's blanket attack on other assertions repeated throughout the affidavits, and which defendant describes as "forbidden boiler plate."  These affidavits are not presented as works of literature, and there is no reason for the government to find different ways of stating facts that have not changed over time.

[26] Defendant also argues that the government already had the evidence it needed that Rahal had paid bribes.  In support, it appears to argue a non-sequitur, saying that there was a piece of evidence – a brokerage commission paid to Intramark – from which a jury could infer that Rahal <u>received</u> a bribe.  But the government says it was looking for information that Rahal <u>paid</u> bribes to the targets, not that he <u>received</u> one.  (Although the government was also looking for evidence that he received bribes from SK Foods.)

[27] Also, the government presumably would search <u>every</u> place at SK Foods for documents, not just places disclosed by the wiretaps. The government does not assert that there were secret document hiding places that were known only to the informant.

[28]  The law in this Circuit is that even if a falsehood or material omission does find its way into a wiretap affidavit, that fact alone is not enough to deny the wiretap or suppress the evidence thus gathered.  Rather, the falsehood or omission must be material to the decision to authorize.  Assuming this assertion was

19

**2. Defendant's Argument: The Artley Affidavit suppressed evidence of the informant's credibility.**

Defendant asserts that the first affidavit depends upon the credibility of the government's informant, Manuel, and that the affidavit "suppressed evidence which demonstrated Manuel's lack of credibility." Defendant's Memorandum in Support of Motion To Suppress Fruits of Illegal Wiretaps at 39 (Dkt. No. 156 at 45**).** In fact, as defendant acknowledges, the Artley Affidavit does disclose the informant's sordid history and the problems with his credibility.

The affidavit discloses that the informant engaged in a scheme to defraud his former employer of $1 million or more; that he faced charges including mail and wire fraud and money laundering in connection with that scheme; that the scheme lasted eight years; that he set up fictitious (front) companies to receive the illegal proceeds of the scheme; that he created fraudulent documentation; that he engaged in self-dealing at his employer's expense; that he engaged in a kick-back scheme; that if he did not cooperate with the government in this case, he faced years in prison for the scheme; and that he continued to take salary and bonuses from SK Foods while informing on the company to the government. The affidavit also discloses that the informant has prior arrests for

---

false, it was not material. The court recognizes the theoretical danger that this rule could encourage the insertion of falsehoods into wiretap affidavits, since the request would be authorized anyway so long as there are sufficient true facts included. Given the law of this Circuit, however, the court has no choice but to trust that this will not happen.

battery and "corporal injury to spouse." In case the court did not get the point, the affidavit spelled out the credibility problem thus: (i) the informant continues "to cooperate with the government in return for consideration on criminal charges to be filed against him;" and (ii) the informant "stands to benefit from a prolonged investigation in which we utilize his information and services because, in addition to being at liberty, he will continue to earn money (including increased bonuses for longer retention periods) while employed at SK Foods."

The only "omitted" information, according to the defendant, is that the informant "was taking proprietary and internal SK Foods information and documents and giving them to Artley." Id. at 20 & 40 (Dkt. No. 156 at 26 & 46). But this accusation does not comport with the facts then before me, the issuing judge. In fact, the first affidavit discloses that the informant provided the FBI agent, Artley, with company e-mails, "internal SK Foods inventory documents," and a tomato paste label that he retrieved after it had been "taken off of a bin at an SK Foods shipping location." First Artley Affidavit (Dkt. No. 166-1) (June 4, 2007) ¶¶ 90 & 92. The second affidavit discloses that the informant provided the FBI agent with an "internal phone list." Second Artley Affidavit (Dkt. No. 168-3) (July 5, 2007) ¶¶ 32, 53, 60, 63, 92 and 95. The third affidavit also discloses that the informant provided the FBI agent

////

////

////

21

with an "internal phone list"[29] and an "organizational chart." Third Artley Affidavit (Dkt. No. 165-10) (February 21, 2008) ¶¶ 51, 54, 56, 63, 67, 69 and 72.[30]

Thus, of the "documents, emails, labels, internal reports, and food samples" that the informant was "tasked" with retrieving on behalf of the FBI (see Dkt. 156 at 10), Artley's affidavits clearly disclose all except the food samples.[31] Defendant does not explain why this omission is material, and the court does not find it to be so.

It is true that the affidavits do not state that the retrieved materials were "stolen" by the informant, thus purportedly undermining the informant's credibility even further. But the government is not required to adopt the defendant's litigation position – that documents taken by an SK Foods employee in connection with a government investigation into SK Foods and others, are "stolen" documents. The government is entitled simply to advise the court that the employee took the documents and turned

---

[29] The affidavits do not disclose whether there is one internal phone list, or more than one. The point however, is that the disclosure of the internal list or lists is repeated throughout the affidavits and is not hidden from the court or concealed.

[30] The fourth affidavit does not appear to contain any additional disclosures of documents taken by the informant and provided to the FBI agent.

[31] The fact that the government did not provide the issuing judge with an item and page count of the documents and materials provided by the informant is not a material omission. The government's description of things the informant did take does not represent a statement that he took only those things and nothing else.

them over to the government.  It did so.[32]

In short, the affidavits repeatedly disclosed the informant's fraudulent conduct against his former employer, his kick-back and money-laundering schemes, his arrests for assaulting his spouse, and the rest of his sordid past.  The credibility of such a person simply is not further undermined by the fact that he took documents from his employer as part of his cooperation with the government's investigation.

**3.   Defendant's Argument: The affidavits misrepresented the informant's access to conversations with the targets.**[33]

Defendant argues that the informant "had significant access to the target subjects who were ultimately prosecuted,"  Def. Suppl. Brief at 9-10 (Dkt. No. 393 at 13-14), contrary to the affidavit's statement that he "does not have full access to their face-to-face encounters or to the content of their conversations over the phone" (Dkt. No. 165-10 ¶ 113).

_____

[32] In any event, the defendant's argument – including his claim that the informant took documents he did not have access to in the normal course of his duties – is in essence a re-play of its argument that the evidence was taken by Manuel pursuant to illegal warrantless searches, and should therefore be suppressed.  The court has already rejected that argument on standing grounds.

[33] Defendant also says that agent Artley lied when he said the informant was "not a party to significant conversations."  Def. Suppl. Brief at 13 (Dkt. No. 393 at 17).  But this misreads Artley's statement.  The statement only says that there were significant conversations to which the informant was not a party. It does not indicate that the informant was a party to <u>no</u> significant conversations.  This is clear from the rest of the affidavit, which details several significant conversations that Rahal was a party to.

Defendant implies, without expressly saying so, that the government hid from the court the fact that the informant continued to make recordings of the targets – including Rahal – and presented them to agent Artley.  See Def. Suppl. Brief at 9 & 9 nn.5 & 6. Actually, the affidavit discloses this fact.  It reveals that the informant taped calls he made to Rahal, and that he taped face-to-face meetings.  However, it also discloses that there were phone calls the informant had with Rahal that the informant could not record, namely, those that the informant did not initiate.

Also, the affidavits do not hide the fact that the informant had significant access to the targets and to the contents of the phone conversations.  What the affidavits do say is that the informant did not have full access to all the face-to-face conversations of the targets, namely, those conversations to which he was not a party.  The affidavits clear up any ambiguity by making clear that among the conversations the informant does not have access to are those between Rahal and Salyer, and Rahal and Beasley, and to which the informant was not a party.  See Dkt. No. 165-10 ¶ 114.  And of great significance, as discussed above, it was the wiretapped conversations that Manuel was not a party to – between Rahal and Salyer, between Rahal and Beasley, and between Rahal and Huey – that were played to the targets and preceded the guilty pleas of Rahal, Beasley and Huey.

But the affidavit does not deny that the informant was a party to other conversations with these targets.  Also, he had access to the "contents" of phone conversations because people told him about

them, but he did not necessarily hear <u>all</u> of them directly. And as noted above, he is a tainted witness in any event.

Finally, the argument focuses on the informant's contacts with targets other than Rahal, which is beside the point. The point of the wiretaps is to get <u>Rahal</u>'s admissions on tape, and those of his co-conspirators, not just to gather more information about the other targets. Thus, defendant focuses on the affidavits' omission of any reference to conversations and recorded phone calls the informant had with targets Coe, Wahl and De Lira, Def. Suppl. Brief at 9-10 (Dkt. No. 393 at 13-14), but they are beside the point because they are not recorded conversations with <u>Rahal</u>. The omission of these conversations from the affidavit is not material, because they have nothing to do with the need for a wiretap of Rahal's phones.

**4.    Defendant's Argument: The affidavits misrepresented the scope of the informant's job.**

Defendant argues, Def. Suppl. Brief at 10-13 (Dkt. No. 393 at 14-17), that Artley deceived the issuing judge by stating that Manuel's assistance was "limited by the scope of his employment with SK" (Dkt. No. 165-10). In fact, defendant argues, the informant's job duties were so expansive that "they touched upon nearly all key aspects of SK Foods' business." Def. Suppl. Brief at 10 (Dkt. No. 393 at 14). The government does not really engage this argument (other than to say the informant's ability to seize documents was disclosed), arguing that "nevertheless," the affidavit sought a wiretap of <u>Rahal</u>'s phones.

It seems fair to say that, as discussed earlier, the "limited" scope assertion was not agent Artley's finest hour, and that he simply repeated a phrase from the earlier affidavits. But it does not matter here. It is true that the alleged breadth of the informant's job duties is relevant to his access to SK Foods documents, samples and employees, as defendant argues. But, no matter how broad the scope of the informant's job duties, nor how many times he was promoted, there is no showing that those duties gave the informant any greater access to <u>Rahal</u>'s phone conversations to which he was not a party, as those conversations are not SK Foods documents to which the informant would have access through his job duties. And, his job duties did not create in him the ability to record phone calls coming in from Rahal (as opposed to those the informant initiated). Defendant simply makes no connection between the "limited" scope assertion and the need for the wiretap of <u>Rahal</u>'s phones.

In short, the defendant is correct to point out that the affidavit "omitted" the alleged facts of the informant's promotion, and his ever-increasing ability to access SK Foods documents, samples and other materials. But the omission is not material, as those duties have nothing to do with the government's need to record <u>Rahal</u>'s phone conversations.[34]

---

[34] There is a nearly limitless number of things agent Artley could have, but did not, include in his affidavit. The issue is whether the omissions were relevant to the request for a wiretap of Rahal's phones. The omissions complained of by the defendant were not. Thus, defendant's complaint that the affidavits did not disclose specific e-mails, instant messages and reports, <u>see</u> Dkt.

1    **5.    Defendant's   argument:   The   affidavit   omitted**
2          **reference   to   the   government's   access   to   an**
3          **undisclosed "informant" – Gregory Wuttke.**

4    Defendant asserts that the government had another informant
5    that it failed to disclose – Gregory Wuttke, an employee of Morning
6    Star.  The government says that Wuttke was not an "informant" at
7    all – a person the government gets information from and whom it
8    provides a benefit to, such as consideration in prosecution or
9    sentencing.[35]  Defendant does not respond to this assertion and
10   continues to call Wuttke an "informant."

11   Defendant's assertion is beside the point however, because
12   there is nothing to indicate that Wuttke could provide the
13   information the government needed about Rahal and Rahal's co-
14   conspirators.  Defendant asserts that Wuttke had contact with
15   <u>Watson</u>, and even recorded a conversation with him (Dkt. No. 164,
16   Exh. A-20).  But there is no showing that he had any access to
17   <u>Rahal</u>, whose phones the government wanted to tap, or to those Rahal
18   was bribing, much less that he could somehow tape all of Rahal's
19   phone conversations, including those to which he was not a party.

20   **6.    Defendant's Argument: The affidavit misrepresented**
21          **the informant's ability to record conversations.**

22   Defendant argues that Artley lied when he said that the

23

24   No. 156 at 27-28 & 36-39 (listing pieces of evidence not disclosed
     in the affidavits), is of no moment.
25

26   [35] The government acknowledges that Wuttke was a Confidential
     Witness for the government, but denies that he was an "informant."

27

informant was limited in his ability to record conversations without attracting attention because he was surrounded by others in his office. Defendant's only support for this is that Manuel did record many targets. But Artley does not assert that the informant could not make *any* recordings, only that he was limited in that ability. And the affidavit sets forth those circumstances, most notably, those in which Rahal initiated the call.

Defendant further asserts that Artley neglected to disclose that the informant "produced more than forty recordings of conversations to Agent Artley prior to February 2008," and others made even before the first wiretap. Def. Suppl. Brief at 15 (Dkt. No. 393 at 19). This is not quite accurate. It is true that Artley did not disclose the <u>number</u> of recordings the informant made, but it does disclose that the informant made recordings <u>with Rahal</u> before February 2008, and even before the first wiretap was sought in June 2007, as well as after the first wiretap was authorized. <u>See</u> Dkt. No. 166-1 ¶¶ 57 (first affidavit discloses the informant's January 29, 2007 "recorded conversation" with Rahal "at a food conference in Sacramento," which the informant recorded "at the direction of the FBI," before the first wiretap was sought), 58 (same; January 31, 2007 conversation); Dkt. No. 165-10 ¶ 45 (third affidavit discloses the informant's recording of Rahal in person on February 4, 2008, after the first wiretap was authorized).

////

////

28

1    **7.    Defendant's Argument: The affidavits misrepresented**
2           **the informant's face time with Rahal.**

3    Defendant argues that Agent Artley lied because he said that
4    the informant "has little face-to-face time with Rahal and little
5    opportunity to get information out of him or to build rapport and
6    trust to do so."  Def. Suppl. Brief at 15 (Dkt. No. 393 at 19).

7    In fact, the affidavit discloses that the informant had face-
8    to-face meetings with Rahal (at least one of which was recorded),
9    and numerous phone calls with Rahal, some of which were recorded.
10   However, the court could possibly get a false impression of the
11   informant's contacts with Rahal <u>if it only read that one paragraph</u>
12   (<u>see</u> Dkt. No. 165-10 ¶ 117).    But the affidavit statements
13   preceding that paragraph make clear that the informant did have
14   face time with Rahal.   In short, rather than being deceptive, this
15   paragraph appears to be a bit contradictory of the disclosures made
16   earlier in the affidavit showing that the informant did have face
17   time with Rahal.[36]

18   Defendant also argues that Agent Artley lied because he states
19   that "Rahal does not even tell [the informant] when he is coming
20   to California."   Def. Suppl. Brief at 15 (Dkt. No. 393 at 19).
21   There is nothing in defendant's papers to indicate that Artley's
22   statement is false.   Defendant argues that the informant did have

23   _____

24       [36]  Defendant also argues that Artley lied about the
     informant's access to target Coe and others.  Def. Suppl. Brief at
25   17-18 (Dkt. No. 393 at 21-22).   But nothing in his argument
     explains away the government's need for a wiretap on <u>Rahal</u>'s
26   phones.

29

knowledge of Rahal's trips to California, but that does not dispute the assertion that Rahal did not <u>tell</u> the informant when he was traveling.

**8. Defendant's Argument: The affidavits misrepresented the effectiveness of the government's surveillance.**

Defendant asserts that the governmnent's surveillance assertions are false, because the surveillance activity was not "ineffectual" as claimed (Dkt. No. 156 at 25), and because the "full scope of productive surveillance" was not disclosed (Dkt. No. 156 at 49). But defendant makes no showing to support these conclusory assertions. Defendant does not explain how the surveillance was effective,[37] nor does he explain what was the "full scope of productive surveillance" that was allegedly omitted from the affidavits. In short, defendant makes no showing – other than assertions in his brief – that would contradict the sworn statements presented by Agent Artley in any way.

**8. Defendant's argument: The affidavits falsely claimed the existence of "moldy" tomato paste.**

Defendant asserts that Artley lied when he asserted that there was evidence that SK Foods was selling tomato paste that was "moldy." But that is not an accurate representation of what is in the affidavit. In fact, Artley states: "This re-labeled paste can

---

[37] In any event, the defendant appears to be imposing the wrong standard. The government need not show that the surveillance was <u>completely</u> ineffective, only that it was insufficient to meet the government's legitimate investigative goals, and to collect evidence sufficient to prove guilt beyond a reasonable doubt.

be either moldy _or not consistent with the customer's_
_specifications_." Dkt. No. 165-10 ¶ 9 (emphasis added).  The mold
report does show that two of the samples had mold, consistently
with Artley's statement, regardless of whether it met FDA mold
standards.  In addition, it appears that two of the samples had an
overall score of "substandard," so there appears to be nothing
false about Artley's assertion that it was not "consistent with the
customer's specifications." Dkt. No. 165-9 at 4 & 5 ("Exh. A-29").
It simply is not a "lie" to say that it was "either moldy or not
consistent with the customer's specifications."

**IV.   CONCLUSION**

Defendant has failed to show that the government was not
entitled to the wiretaps and extensions it sought.[38]  Accordingly,
defendant's motion to suppress the wiretap evidence (Dkt. No. 154),
is **DENIED**.

IT IS SO ORDERED.

DATED: January 11, 2012.

_Lawrence K. Karlton_
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[38]  The extent and impact of the alleged falsehoods and
omissions in the government's affidavits may be determined from the
face of the affidavits, as discussed above.  As discussed above,
most of the alleged falsehoods are not false, and the omissions are
not material to the wiretap authorization decision.  The arguably
false inclusions in the affidavits – the scope of the informant's
job duties, and the need to find out where SK Foods documents were
located – were not material to the wiretap authorization decision.
Accordingly, there is no basis for a hearing pursuant to Franks v.
Delaware, 438 U.S. 154 (1978).